Your argument in Walters v. Norton Good morning, your honors. My name is Karen Vance. I represent the plaintiff Gloria Walters. And just to bring the court up to date, Ms. Walters is now 64 years old and still working at the Department of Interior. And she's working for a man that's 25 years her junior since 2002. Did you reserve rebuttal time? Yes, I did. How much? Three minutes. Okay. And she has no plans to retire. So that's where we are today. The question for the court today is whether or not there is anything for a jury to decide. And we believe there was. We believe that the district court erred in this situation when it went ahead and weighed the credibility of the evidence and did not resolve all reasonable doubts in favor of Ms. Walters. It decided disputed facts in favor of the Department of Interior, which was the non-moving party. And it weighed and decided issues of disputed fact against Ms. Walters. If you look at page 6 of the opinion, the district court states that Ware was selected because he had a slight advantage over Walters. And a slight advantage over Walters in each of the five KSAs, ultimately Ware had superior interpersonal skills. And then the district court launches off and proceeds as if there were no facts and proceeds on those facts and proceeds to weigh the evidence with regard to the issue of interpersonal skills and resolves all those facts against my client, Ms. Walters, not giving her the benefit of the doubt as required by the case law and not viewing the facts. What evidence did you put forward which would indicate not that the government made a bad decision or should have made a different decision, but that the decision that the government put forth that they're saying that she lacked the interpersonal skills that he did, that this was a pretext for discrimination? Yes, Judge Cohen, I would say that that's a red herring. The whole – if you read all the briefs, forget about interpersonal skills for today because the issue before the court is whether or not Ms. Walters was – there was sufficient evidence to go to a jury as to whether Ms. Walters was more qualified than Mr. Ware. And we submit she was. That's the red herring. Did you just say forget about interpersonal skills? Yes. I thought management requires interpersonal skills. Not in this situation. That was not one of the – was not encompassed within the – In her application at page 189 of the appendix, she says, with this in mind, I have always utilized my interpersonal skills, such as good feelings, tone, eye contact, appropriate body language, good manners as a means of building relationships while acquiring information, et cetera, et cetera. She believed when she filed the application that interpersonal skills were a requirement. Your Honors, they're part of it, but they were not the heart of it. The heart – Forget about it. You have to look at the vacancy announcement, Your Honors, which is in – and this is where I think the district court went off and went down the wrong tangent. Well, did the vacancy announcement indicate that interpersonal skills were required? No, it did not. The court said that, but that was an incorrect statement. If you look at the vacancy announcement on page 176 of our appendix, you'll see that the district court quoted out of context the issue of interpersonal skills. He simply says that the incumbent assists the RAM, that's the supervisor, in the day-to-day audit and administrative operations of the office. And then you have to read on. That's just the major duties. Yeah, well, just a second. I happen to have that zeroed in right here. The vacancy accomplished interpersonal skills, KSA 2, required the ability to plan, supervise, and management multiple complex audits. KSA 3, calling for the ability to communicate and interact with management officials at all levels of organization and present and defend audit findings. KSA 5, requiring the plan and direct special project. These things are obviously supervisory, you know, interpersonal skills required, not physical tasks. Your Honor, they are, of course, inherent, but they're not specifically stated in the nature of this job announcement. That's a question for the court. What job did Ms. Walters apply for? She applied for the GS-14 job. The GS-14 job was not the GS-15 job. What Mr. Van Beeverhout did when he promoted Mr. Ware was he was taking into consideration the GS-15 job. But when Ms. Walters applied, Mr. Van Beeverhout, the GS-15, was running the office. He was not hiring his replacement. The GS-14 job, if you read the job announcement, is a technical auditing job. And at that time, Ms. Walters had the superior qualifications over Mr. Ware's. She, and I also do, not to cut you off, Your Honor, but I do want to state that Ms. Walters did have interpersonal skills and that if you look at the record and you look at the reviews that are in the appendix, she had always met results achieved. It wasn't that she lacked interpersonal skills. It's just that Mr. Van Beeverhout, who was the sole decision-makeró Well, she did get into some disputes with some of her fellow workers. She doesn't dispute that. Well, she doesn't dispute that, Your Honor, but the question is whether or not she should have been deprived of this promotion that she was more qualified for Mr. Ware because of that. The issue was whether or not she qualified for this GS-14 position. And in order for Mr. Van Beeverhout to promote Mr. Ware, a 33-year-old male from St. Thomas, and his favorite, he had to construct a certain situation, and that situation was to make the two candidates equal. But if you look at the two candidatesó and this is what the material fact is for the jury to decide, Your Honorsó is that Walters was not equal and that the false premiseó the false premise was that constructed by Mr. Ware, which is that they were equal. And that's where the discrimination started. In order to promote them, we have a sole decision-maker. This isn't like the situation in Jackson v. Gonzalez where there's a test and there's people taking tests and one scored higher than the other. And in that situation, the candidate that scored lower was not promoted. He sued. He lost. Well, this is a situation where we have one man making one decision, picking someone they've worked with. And what happened is that they ignored the fact that the material facts in dispute were whether or not the premise was true that Ware was as qualified as Ms. Walters. We submit, Your Honors, that that was not considered by the district court below and that those are the material facts that are in dispute. The lower court ignored those facts and proceeded on the path of determining whether or not Walters was at fault for interpersonal conflicts. And I'm afraid also this court is going down that road also. But what we have to focus on is whether or not Ms. Walters had the ability and had a superior credentials to Mr. Ware. We submit this fact should beó What are those credentials? Okay. I'm glad you asked. Let's see here. She'd been there longer. She'd served in the GS-13 job a little longer. Okay. Okay, Ms. WaltersóOkay, if you look at the GS-14 position, it's not the kind of position that requires Mrs. Nice Guy. Okay? Mrs. Walters had been involved in long, lengthy audits that led to criminal convictions in agencies that she audited. She obviously could get along with people. That's field auditingóI'm listing the credentials. So auditing experience in the field, would that be one? Yes. Well, she has way more time in the field. First of alló There was no doubt that she and he technically were probably very similar. No, they weren't. Walters had six years as a GS-13. She probably would have been better at the technical skill. Your Honoró We're dealing with a supervisory position here, correct? She'd been doing the job for six years. All right, let's assume you're correct that technically she might have an edge, technically. But we're dealing here, and the government and certainly the district court made its decision based on supervisory ability. Which had nothing to do with the KSAs. It's not in there. Even if you read what the district court saysó Judge Cowan just read to you two KSAs that, unless I missed something, deal directly with thoseó I read to you her answer on the third KSA, where she discusses the importance of interpersonal skills and how she has them. Right, but if youó She has admitted that interpersonal skills are a part of the KSA 3. If you look at number 3, Your Honor, the ability to communicate and interact with management officials at all levels of an organization, present and define audit findings. That is the target organization. That's not whether she gets along with all the girls in the office. What it says hereóher answeróI'll read a little more. As an auditor, one comes in contact with many individuals while gathering information and through the interview process. The ability to effectively communicate and have ongoing positive interactions is critical to an auditor's success, etc., etc. I talked about the eye contact and all of that stuff. That includes the girls in the office, as you put it. Not necessarily, Your Honor. Not necessarily. But there's no evidence that she didn't get along. If youó The other one with the car and the one with theó Well, if you read our brief, the car one was totally reasonable. She was required to give this lady a job. How about your own written rebuttal to the 2000 appraisal? WhereóI think itó Yes, Your Honor? Demonstrated a lack of interpersonal skills that even maybe insubordinate subordination. Have you read the review? Because that's what I think is key. I mean, there's this whole focus about how Mr. Ware was Mr. Nice Guy and he got along with everybody in the office. But the issue is whether or not this woman was qualified as a good auditor to go in there and dig out facts and have people convicted. That's the job that she applied for. You're saying she's going to go back out into the field? I thought this was a management position. You're suggesting that she's really good at going out into the field. She has to supervise audits. She'd been doing that for six years. Mr. Ware had only been doing it for 21 months. She did lengthy, lengthy audits that were highly technical and worked with many people in many organizations. And in doing that, she secured convictions. This was not the job that she applied for. Now, Mr. Van Bieberhout had his crystal ball out and said, well, I'm going toóoh, I see my time is up, Your Honor. He said he was going to retire, and he did in 2006. But we have to look at the KSA. He was concerned that she would be the one in charge of the office when and if he did retire because of her lack of interpersonal skills or that he wouldóthat's incorrect. I think he says Mr. Ware has the right combination of technical skills and interpersonal skills to try to bring the staff together, assisting me as second in charge of the office and ultimately as the officer manager after I retire. That was his assessment. As the sole decision maker, and I sayóif you look at our brief, page 5, and I can cover this on rebuttal, Your Honors, or do you want me to continue? Are you sure? Okay. If you look at our brief, there were affidavits in the EEO record from senior auditors saying that Ms. Walters' qualifications were better than Mr. Ware's. Thank you. And I have some time reserved. Mr. Aikman. Good morning, Your Honors. Before you even start, my question to you isóI read the KSAsó but if interpersonal skills were the sine qua non here, why didn't you put it right up front in these KSAs instead ofó it's there, but it has to be applied, and why didn't you just say so in plain English? May it please the Court, Tim Abraham from the United States. Judge Cowen, the interpersonal skills was a coined term used by Ms. Walters and by Mr. Van Bieverhooy. It combines several factors, which include management skills, supervision skills, communication skills. It's a coined term. If you look at the KSAs, KSA 2 and 3 say manage and supervise. They say communication. In fact, the case cited by plaintiffs, the Jackson case, is the D.C. Circuit saying that even when a criteria is not expressly listed in a vacancy announcement, in a government vacancy announcement, that's not enough to survive summary judgment. And I want to return, Judge Cowen, first to the point that you made in your questioning. There is no evidence of pretext here. Appellant has misstated the issue in this case. She got up and said the issue was whether there was sufficient evidence of her qualifications. That's absolutely not correct. The standard influentis is very clear and cited in both briefs. The plaintiff must present evidence that casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a fact finder could reasonably conclude that each reason was a fabrication. Well, her position is obvious from her argument and from her brief that her qualifications were so superior and long that it could be no other reason than pretextual. Your Honor, that's – You can't say she's not trying to show you how to – this is your position that he had higher interpersonal skills as pretext. She denies that, saying that she had longer and better skills than he had. And she states that, Your Honor, but the evidence shows that their qualifications were quite close. Mr. Van Beever Hoyt actually says this in explaining himself that he felt that they were technically quite equal. He does not try to shade this against her. In fact, he is the one who promoted her twice in 91 and 96. He promoted three women to the GS-14 – two other women to the GS-14 position. He promoted three women to the GS-13. He paved the way for her to compete for this position, okay? But this position was a management position, so he considered management skills as well as technical skills. And what he says in his supplemental affidavit is, I found that Ware, Mike Ware, was slightly better in the technical skills and that – but he was far superior in the management skills, and he coined the term interpersonal skills. What were the evidence that he relied on to show that she was – that he was on the management skills, that he was superior? I don't like the idea that he's relying on allegations that have never been proven, that there was a spat with – in the office and so forth and so on. That always happens in any office, you know, but there's no definitive statement here that, you know, who's wrong or right unless there was an adjudication. Well, Your Honor, he's not relying just on the allegations. He worked with both of these people and supervised them for 12 years on the job, and both of them had – he gave supervisory responsibility when he could and allowed them to be in charge of the office when he could. She misstated something that I'll just quickly address. She said that Mike Ware only supervised audits for 21 months. That's absolutely incorrect because when both of them were GS-12s, he said, why don't I prepare you to be a GS-13 and allow you to supervise audits? Now, your question about the qualifications, remember this. Don't be thrown off by the difference in age in the record because Ms. Walters went to the college, graduated college at the age of 41 and joined the agency officially as a full-time employee at the age of 43. Mr. Ware joined the agency at that same GS level, GS-7, at the age of 21. So both of them were – the only difference in their work experience was perhaps four years. She was with the office four years longer. And in that time, both of them had substantial responsibility over audits. They both were given supervisory responsibility, and he was able to observe how both of them got along with people they were auditing, with people they were supervising. So it's his view, his experience of viewing both of them that he gives her the – him the edge on interpersonal skills. That's correct. That, to me, is very subjective. Why shouldn't a jury find out whether or not, look, he likes him and doesn't like her or he's got an axe to grind with one or wants to throw a fable? That's very, very, very subjective. I don't know what other word to use here. And wouldn't a jury be more appropriate to resolve that? No, Your Honor. As you stated in the Brewer decision, subjective criteria by itself doesn't require a trial. Oh, fair. That's a prior consistent statement which was hearsay. Okay, well – He just wanted to make sure that you had read his fine opinion. You brought up the wrong case. I've been criticized for that case terribly. Can I ask for a little bit of instruction? I take it back. Well, I think the point is, Your Honor, that the managers, they look at – he was looking at 12 years of dealing with both of them, and he just didn't hang his hat on interpersonal skills. So I don't think Your Honor should be concerned about that. Well, that, to me, is the key to the case, interpersonal skills. And we got a guy here making decisions based on what he saw, what he perceived, right? Well, maybe – why are we trusting his perception? Let's look at the record, Your Honor. Let's look at what his supervisor said. Roger LaRouche, the number one audit person in the agency, said he would have picked Mike over Gloria. Excuse me, Mr. LaRouche. He was a friend of hers. He was a friend of hers, and not only that. Mr. Van Bieverhoit testifies in his deposition that Mr. LaRouche could have overruled his decision if he wanted to. And, in fact, after Mr. Van Bieverhoit retired in 2006, Washington, D.C. could have done whatever they wanted. They could have replaced Mr. Ware. They could have sent somebody else from Washington and said this is the new GS-15. But Mr. Van Bieverhoit knew that because of economic considerations, it was possible that the GS-14 he picked would be the person that was responsible for leading the office into the future and that the office may not survive if that person could not unite people and be a good manager. Now, not only did he say that, the direct supervisor, Ms. Chados, also said she would have picked Mike Ware. And she was the one who was evaluating both of them in 2000 and in 2001, and she was – and I'd like to point out, she was the GS-14 before them, and she had to do the type of things that whoever was picked would have to do, which includes dealing with subordinates, writing up their performance appraisals, getting along with people that were being audited, and directing and supervising the audits. I think the district judge recounted a lot of this. But then, I don't know, he referred to the preponderance of the evidence, I remember, in making his summary judgment conclusion, which really raised a red flag for me, showing that he was weighing the evidence instead of saying that there was no evidence here of pretext. I respectfully disagree, Your Honor. I saw that for sure. Well, what you're saying is correct, that the preponderance of the evidence term was used on page 4 of the opinion. Let me just read for the court what he says here. He's describing – he starts out at the top of page 4 of his decision talking about the burden-shifting analysis, talking in general terms. Then on the second paragraph he says, once the plaintiff has satisfied the prima facie standard, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason. And I'm just paraphrasing here. That's what we've done. Now here's the part Your Honor is referring to. Should the defendant successfully carry its burden, the plaintiff then has the opportunity to demonstrate by a preponderance of the evidence that the employer's stated reasons were not its true reasons but were a pretext for discrimination. He cites Stempier. That's his talk of the general burden-shifting. I think that's his talk of whether there's facts to show that there's a pretext. He's weighing the evidence. There's a preponderance of the evidence. I respectfully disagree, Your Honor, because in the second – in the very next line of the opinion, he cites the appropriate legal standard, which is to defeat a summary judgment motion and show pretext a plaintiff must discredit the proper reasons for the adverse employment action directly or circumstantially I agree with that. He made up for it when he did. But for a judge – I've been a district judge. To – you know when you're granting summary judgment, you never say preponderance of the evidence because that's – you're weighing the evidence if you say preponderance of the evidence. And he said it right there before he got to the correct standard of review. Your Honor, what matters is he applied the correct standard. Now would I have preferred that he didn't use that bracketed language in there? Sure, Your Honor. If we move on to one of the arguments in their brief, which is that he impermissibly somehow weighed the evidence, if you look at what he talks about – and we've discussed this in our brief as well – what he talks about late in the decision is the fact that the record supports what Mr. van Beverhooy decided. In other words, Mr. van Beverhooy found that Ware had superior interpersonal skills to her in making his decision. That was one of his legitimate reasons that he put forward. And they failed to cast doubt on that. Not only that, the judge points out she admits those disagreements. She's admitting those disagreements happened, and it's not enough for her to say – I'm not saying that she was wrong though. I'm sorry? There was no adjudication that she was at fault. Well, there was a 2000 appraisal where they found that she didn't follow the leaf-slip procedures and got into a big fight with the administrative assistant over a small, petty thing. So – well, Your Honor, I think it clearly affected her, and there was an adjudication essentially by the supervisors there. They had a choice to – they heard from all the sides, and they wrote up an appraisal and essentially put their decision in the appraisal two years before they put this vacancy announcement out for the replacement for Ms. Chados. That was eight years ago. I'm sorry? That was eight years ago. Correct, correct. Sometimes playing well in the sandbox requires you to back off even when you're in the right. Does it not? Yes, Your Honor, and as you can see from her response to the summary rating, although she didn't formally grieve the appraisal, she wrote a very nasty response to it in which she did not deny that she had the SPATs. Secondly, she did not say anything about the fact that she broke chain of command and contacted the number one auditor in the agency to complain about her bosses. She didn't deny that in her, quote-unquote, nasty response. Maybe I shouldn't use that term. And it shows in the record. If you look at her response to the appraisal, and then you look at the boss's email at Joint Appendix 404 to 406 to the number one auditor explaining all the problems he's had with her, quote, she tends to be at the center of all the interpersonal disputes in the office, unquote. He said that in 2000. Why would he put that person in place? And what have they done to show that his choice to not put her in place was discrimination? What have they done to cast doubt on his explanation? They've done nothing. So, Your Honor, I just want to review my notes briefly and see if I can weigh in on some of the facts that she was talking about. We talked about the fact that he did supervise audits more than 21 months, Mr. Ware. She uses terms like he was her favorite or he did this as a construct. He constructed this whole scheme to promote Mr. Ware. There's no evidence of that. They haven't shown any evidence to cast doubt. More importantly, her own admissions show that there's consistency here in the legitimate reason. Rather than carrying her burden and showing why it was inconsistent under Fuentes or implausible what reason the employer gave, she proved up the employer's reasons or contributed to them by admitting that these disagreements happened. In fact, at one point she says, I think that the supervisor doesn't like me because of all these other people complaining to him about me. And she knew these things were happening, but she never went to the supervisor and set her aside. She never went forward and tried to clear it up. She never approached the people she had conflicts with and tried to make peace. And you'll notice that the person he picked also got several awards and promotions, and he didn't have these problems. You know, it is more than a case, as I view it, of interpersonal disputes. As I read all of the evaluations in the appendix, her evaluations were good, but there was no music there. I read Ware's, and there was music there. I don't know how better to describe it. But there was—yes, she was a good auditor, and yes, she did this well, but there was no real enthusiasm for her work. So, I mean, it's a balancing here of a number of things, and I think basically it does relegate to what is at bottom a pretty subjective decision when you're dealing with people who are pretty equally qualified. Well, sure, Your Honor, but that doesn't establish pretext. And as you were referring to the music, some other music that was sung about her specifically was in the 2001 appraisal, the most recent appraisal before the posting. They were glowing about Mike Ware's communication skills and said hers were satisfactory. Satisfactory and good and, you know, this type of thing. And that's consistent throughout the appraisal. And are managers allowed to use subjective criteria? Certainly they are. And they should contemporaneously document what they're relying on, and that's what they did here. There's documents and records in the evidence. In fact, one of the—Ms. Chados, when asked to describe Ms. Walters on that point you're saying about her attitude towards the job, and this is in the brief, she says she looked like someone that was— and I'm paraphrasing—someone who was just there to get her paycheck. In fact, she says that she said that to her at one point. She called her an angry person. I see my time is up. Thank you, Your Honors. Your Honors, the focus today is not whether or not—whether or not—I mean, like Your Honors said, you're not supplanting your judgment for the supervisor's decision whether to promote. The question now is whether or not there's significant credible evidence to go to the jury and whether the reasonable employer would have found Mrs. Walters to be better qualified for the job, and there was. And there was enough evidence in the record for the fact finder to conclude to rebut the premises that are before the court. We just need more than a scintilla, less than a preponderance. Now, Your Honor talked about music. I think Mr. Van Beeverhout wanted rock and roll when Mrs. Walters was Brahms. Okay? And that's the subjective decision. But that's a difficulty with your case. I mean, I think Judge Cowan and Judge Berry both mentioned it. I'll join the chorus. This is a very subjective decision, and that puts the plaintiff's counsel in a very difficult position in trying to rebut the legitimate non-discriminatory reason that's been articulated. It may be, Your Honor, that we may not prevail in front of a jury with what you've seen here, but there's enough to get through summary judgment. Well, but you've got to tell us what that is, and one thing I noticed in your brief, I think you say in your brief that the office was always managed by men, right? Yes. Always been from St. Thomas. But Esther Smith wasn't? Hadn't Esther Smith been promoted and hadn't Stacey Chados been promoted? They're women. They weren't running the office, though, Mr. Van Beeverhout had. Chados, by the way, didn't like Ms. Walters. I took her deposition, just so you know, and it was clear when I met her. And Chados was the one that Walters went above. It wasn't Ms. Van Beeverhout when he talked about the nasty phone call. Chados had an ax to grind with Walters, just so you know. I guess my point is Chados was in a management. She was a level above, right? I mean, I guess my point is in trying to find something here to rebut the legitimate nondiscriminatory reason, the notion that this was a boys club and the women weren't allowed in management, I'm not seeing that as consistent with the record, in light of the positions held by Chados and Smith. I don't think that's the issue, Your Honor. The issue is whether or not we have enough credible evidence, as stated in Fuentes. We just have to get it. But speaking for myself, you need to tell me what that is. You can't just say we have credible evidence. They have articulated a legitimate nondiscriminatory reason, i.e., management position, she had poor management communication skills, she had been written up, et cetera. What evidence can you point us to that shows that that explanation is implausible, incoherent, or inconsistent? The reviews, Your Honor. Every single one, if you look, especially the one Chados did, they all say number one, or A, management and supervision, and then it goes into the description of whether or not she can work within the office. But Judge Hardiman was asking about gender discrimination because you allege gender discrimination. What is the evidence of gender discrimination that she was discriminated against because she was a woman? You allege that. And what is the evidence of that? We believe it was Mr. Van Beeverhout's subjective belief that he thought a man could better run the office and that Ms. Walters was contributing to catfights within the office. So every time a man gets a job, a woman doesn't get a job for which she competes, it is gender discrimination? No, Your Honor. I'm not saying that. But you have to look at the fact that we're talking about a 58-year-old female as opposed to a 33-year-old male. The prima facie case doesn't disappear. And so in this situation, the question is whether or not Ms. Walters has rebutted this issue of personality problems, which I think she has. She was better qualified, and on every single one of her reviews, she got results achieved. So then the question is, do we? And the district court goes down this road and starts talking about weighing the evidence as far as going into e-mails talking about, and it may not necessarily be gender. I think, Your Honor, my gut feeling it was age, okay? Well, you raised gender, though. I know. And then you raised downhill. How do you separate the two? How do you separate the two? The old woman shouldn't have the job. How do you separate them? I've had many cases like that. But is there any case law to support the notion that when you've got a 36% case on age and a 25% case on gender, you can put them together for 51%? I'm unaware of any precedent that supports that notion. I've never heard of that, Your Honor. I mean, I wish there was. I'd cite it. You base this case on gender discrimination. I didn't look at it any other way. You were basing it on age discrimination. And age. It's an age case. That's what I was talking about. That's why I started out. We have a 64-year-old working for a man 25 years her junior. And that's when we get into the whole thing that Judge Sanchez totally discredited by digging into the evidence that wasn't even part of the record, essentially. It was something, I don't think it was in their brief, but he dug into the appendix, where he starts talking about in the long run, and that's how this case started. But he's used that before. He used that. But that's exactly it, Your Honor. The judge weighed the evidence that should have been in front of the jury, and that's my point. Thank you. Well, we understand your argument. We will take the case under advisement, and the clerk will adjourn.